UNITED STATES OF AMERICA,

     Plaintiff,

     v.

                              Civil Action No. 10-2111 (JEB)

SPEQTRUM, INC.,
d/b/a Speqtrum Health Care Services,

     Defendant.

## MEMORANDUM OPINION

     Florence Nightingale once said that "nursing is an art."  In this case, the Government

contends that employees of one D.C. healthcare provider were better schooled in the art of fraud

than the art of nursing.

     Defendant Speqtrum, Inc., is a home-healthcare agency that furnishes the elderly and

disabled with assistance in the day-to-day activities of living, such as bathing, dressing, and

taking needed medications.  D.C. Medicaid, which is subsidized by the federal Medicaid

program, pays for many of Speqtrum's services for low-income patients.  Somewhere along the

way, Speqtrum developed a habit of cooking the books: overbilling for hours not worked,

charging the District for clients it did not service, and forging physician signatures on its

paperwork.  In addition, many of Speqtrum's patient files omitted required treatment-related

documents altogether.  The District's Department of Health Care Finance discovered this

massive fraud during a routine audit of Speqtrum's paperwork in May 2009.  The federal

Government began its own investigation shortly thereafter, and this lawsuit – alleging violations of the federal False Claims Act, among other laws – followed.

The Government, presenting ample evidence of intentional fraud, now moves for summary judgment. Speqtrum, adducing almost no evidence of its own, opposes and cross-moves for summary judgment. Because the Government has carried its burden in proving at least some of the FCA violations alleged, the Court will enter partial judgment on liability but will require the Government to present additional evidence of liability and proof of specific damages at trial. Speqtrum's cross-motion will be denied in its entirety.

## I.     Background

The federal Medicaid program is designed to protect the most vulnerable among us. As a jointly funded state-federal effort, it subsidizes healthcare for "low-income persons who are age 65 or over, blind, disabled, or members of families with dependent children," as well as "pregnant women" and "children." 42 C.F.R. § 430.0; see About Us, Medicaid.gov, http://www.medicaid.gov/About-Us/About-Us.html (last visited May 23, 2014). To that end, Medicaid funds may be used to pay for home-healthcare and personal-care services. See Medicaid Long-Term Care Services, LongTermCare.gov, http://goo.gl/VtK8Sp (last visited May 23, 2014). Those at-home services help seniors and others who are struggling to live independently to avoid nursing homes and other forms of expensive, long-term care. Id.; see also D.C. Mun. Regs., tit. 29, § 5000.2 (Personal-care-aide services are designed "(a) To provide necessary hands-on personal care assistance with the activities of daily living"; and "(b) To encourage home-based care as a preferred and cost-effective alternative to institutional care."). [1]

---

[1] All references are to the 2006 version of the D.C. Code, which was in force at the time of Speqtrum's alleged conduct.

Needless to say, budgets for these programs are not unlimited.  As a result, states and the federal government tightly regulate Medicaid and have devised stiff penalties for defrauding the program.  States are the primary drivers of Medicaid regulation. The District of Columbia, for example, has set guidelines that Medicaid providers must meet to be reimbursed for certain services.

In terms of personal-care-aide (PCA) services, providers and their PCA patients must clear several hurdles to qualify for D.C. Medicaid funding.  To begin with, patients must have a prescription for PCA services from their medical professional, see D.C. Mun. Regs., tit. 29, § 5004.1, based on a finding that they "have functional limitations in one or more activities of daily living" – such as bathing, dressing, or administering vital medications – "for which personal care services are needed."  Id. § 5005.1.  After the doctor writes a PCA prescription and the patient receives a referral, the provider must assess "the patient's functional status and needs" within 48 hours.  Id. § 5006.1.  Seventy-two hours after that, it must draw up a plan of care for delivering services per the doctors' orders and patient's needs.  Id. § 5006.2.  Those plans must "specify the frequency, duration[,] and expected outcome of the services rendered," and they must be approved and "signed by the physician within thirty (30) days of prescription."  Id. §§ 5006.3, 5006.6.  A registered nurse must review the plan every 62 days, and any "update[] or modifi[cation]" must be signed by the physician.  Id. § 5006.6.  Services must be reauthorized by a physician or advanced-practice registered nurse every six months.  Id. § 5006.4.

In addition, all licensed PCA-service providers are required to "maintain accurate records reflecting the specific personal care services provided to each patient."  Id. § 5007.2.  Those records must include "past and current [medical] findings, the initial and subsequent plans of care, and the ongoing progress of each patient," as well as a "[d]escription and dates of services

rendered, including the name of the personal care aide performing the service." Id. §§ 5007.1, 5007.8(c).

If a provider "[k]nowingly and willfully ma[kes] or cause[s] to be made any false statement or misrepresentation of material fact in claiming, or in determining the right to, payment under Medicaid," then the District may refuse to reimburse that provider for its services. Id. § 1301.2(a). The provider's agreement with the District, allowing it to render PCA services, may also be terminated. Id. §§ 1301.3, 1302.1.

On top of those penalties, because the federal government funds roughly 70 percent of D.C. Medicaid, see Alison Mitchell *et al.*, Cong. Research Serv., R43357, Medicaid: An Overview 35 (2014), the United States may also seek to recover funds fraudulently obtained. Under the False Claims Act, a provider may be liable if it "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)-(2).[2] Providers that violate the FCA may be "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." Id.

In this FCA case, the federal Government alleges that Speqtrum, a home-healthcare and PCA-service provider, defrauded Medicaid of over a million dollars. The Government charges Speqtrum with a pattern of fraud encompassing both (i) charging the Government for services

---

[2] Although the Government cites the current version of the False Claims Act in its briefs, the fraudulent activities at issue in this case appear to have occurred almost entirely when a prior version of the Act – which was amended on May 20, 2009 – was in effect. See Fraud Enforcement and Recovery Act of 2009, § 4, Pub. L. No. 111-21, 123 Stat. 1617, 1621-25 (2009). The Court is not aware of any substantive difference between the two versions that would affect this case, with the exception, perhaps, of some language relating to the Government's "false statements" allegations. The Court will turn to that issue later in the Opinion, but will use the pre-May 2009 version of the Act for the time being.

not rendered – *e.g.*, services allegedly provided to dead or hospitalized patients – and (ii) charging the Government for unauthorized services – *e.g.*, services that were rendered without an operative plan of care.

At this juncture, the Court views the evidence in the light most favorable to the non-moving party, and when facts are in dispute, the non-movant's version governs. In this case, however, because Speqtrum did not produce any affidavits, declarations, or deposition transcripts – or much of any other evidence that the Court could consider at this stage – the Court must treat the vast majority of the facts offered by the Government as conceded. The picture that evidence paints, along with Speqtrum's meager evidentiary contributions, is quite grim.

In late May and early June of 2009, DHCF – which is responsible for D.C. Medicaid compliance – conducted an audit of Speqtrum's D.C. office. See Mot., Attach. 2 (Declaration of Gregg C. Domroe), ¶ 6; Exh. 10 (DHCF Notice of Overpayment Recovery) at 1; Exh. 11 (DHCF Notice of Termination of Provider Agreement) at 2. Such audits are routine and are provided for by D.C. law. See D.C. Mun. Regs., tit. 29, § 5010. During DHCF's visit, its employees randomly reviewed the records of 220 Medicaid beneficiaries. Domroe Decl., ¶ 6; DHCF Notice of Termination of Provider Agreement at 2. Of those records, 208 lacked the documentation required to legitimize the services allegedly rendered. Domroe Decl., ¶ 7. Some files had no plan of care, or the plan of care had gone unsigned. Id., ¶¶ 8, 12. Other plans of care contained forged signatures, as multiple doctors later confirmed after examining the fabricated records. Id., ¶¶ 15-16; Mot., Exh. 3A-E (FBI Doctor Interviews). Other files lacked records to substantiate the amount of time PCAs had supposedly spent with patients. Domroe Decl., ¶ 9. Still other files revealed overbilling for services not rendered, id., ¶ 10, or that the patient was not even receiving services from Speqtrum. Id., ¶ 13. One patient's file could not be located, and DHCF

soon discovered that the patient had died prior to the dates on which Speqtrum purported to render its services. See DHCF Notice of Termination of Provider Agreement at 2.

Later that year, the FBI and other government agencies pulled twenty random files belonging to patients who had supposedly received care from Speqtrum seven days a week for eight hours per day. Domroe Decl., ¶ 18. Fifteen of those twenty files contained fraudulent claims, according to interviews with the patients themselves. Id. One of the beneficiaries, for example, received care only from 10 a.m. to 4 p.m. five days a week. Id., ¶ 20. Other patients similarly received services from Speqtrum, but for a lesser number of hours or days per week. Id., ¶¶ 24-27. Another patient claimed she had been receiving services through Ultra Home Health Agency – and only through Ultra – for about four years. Id., ¶¶ 22-23. An FBI agent confirmed that Ultra had been billing Medicaid for PCA services during the same period that Speqtrum claimed it had rendered services. Id. It thus appeared that Speqtrum had never, in fact, provided the patient with any of the $19,714.59 worth of services that it had billed for. Id. Yet another purported patient never received any home-healthcare services whatsoever – and had no need for them. Id., ¶¶ 29-30. Speqtrum had nevertheless billed Medicaid for almost $14,000 in services on his behalf. Id.

On July 15, 2009, the FBI and other agencies executed a search warrant and seized piles of documents from Speqtrum's D.C. and Maryland offices. Id., ¶ 32. The documents collected tended to confirm that patient files contained forged signatures or falsified timesheets. One document appears to contain various trial runs at forging a doctor's signature – which later appears in a patient file. See Mot., Exh. 5 (Trial Signatures and File). Another set of documents consists of pre-signed timesheets – initialed in advance by patients – which PCAs could then fill in with (potentially) inaccurate hours. See Mot., Exh. 9 (Pre-Filled Timesheets).

Yet another document alerted Speqtrum's President and Founder, Pauline Nnawuba, to the fact that a high-level employee had been defrauding Medicaid on the company's behalf. See Mot., Exh. 6 (Ahouste Memo). Until about 2008, Joahana Tingem, the Director of Nursing, hired family members who were not licensed to provide PCA services. Id. at 1. She was, moreover, billing for services she had not rendered, including services supposedly provided to hospitalized and deceased clients. Id. She even used the identities of other PCAs to collect Medicaid money for herself. Id. In doing so, she forged both doctors' and patients' signatures. Id. Tingem was eventually fired, but Nnawuba never alerted DHCF of the fraudulent charges she had made.

As a result of the audit and investigation, yet another high-level employee – Florence Nguh, Nurse Director of Case Management – was fired in late 2009 for similarly conducting illegal activities on Spectrum's behalf. Her termination letter, which the FBI acquired, noted that she had "billed D.C. Medicaid for potentially illegal nursing and personal care assistant services and diverted those funds" into her own personal accounts. Mot., Exh. 7 (Florence Nguh Termination Letter). According to Camille Gabriel, Speqtrum's Assistant Quality Assurance Manager, both Nguh and Shola Adebusoye, the new Director of Nursing, knew that many of their patients had no plan of care in place. Mot., Exh. 15 (FBI Interview with Camille A. Gabriel) at 1. When Gabriel would bring it up, Nguh and Adebusoye told her they would "handle getting the approval." Id. The issue was also raised at staff meetings. Id. at 1-2. According to Gabriel, Nnawuba knew about these problems. Id. at 1. Other staff members complained to Nguh that PCAs were billing for hours they had not worked, yet nothing was done. Id. at 2-3. Similarly, Speqtrum was notified that some PCAs were paying off their patients to collude in the fraud. Id. at 3. Another employee testified that Speqtrum generally and

Nguh specifically knew that there were problems with the files, but would generally be tipped off and would "clean up" the files before auditors arrived.  Mot., Exh. 16 (FBI Interview with Jozanne Browne) at 1-3.

Nnawuba, meanwhile, maintained that she had no idea what was going on in the D.C. office – or, apparently, within the company she founded and ran in general.  When asked if she was "knowledgable [*sic*]" of her "company's Medicaid compliance practices," she responded, "Not [at] all because I hired somebody in charge of that."  Nnawuba Depo. at 20:3-6.  She also delegated all hiring authority for the D.C. Office to her Director of Nursing, who was Shola Adebusoye at the time of the audit.  Id. at 30:17-32:24.  The Director of Nursing was also in charge of making sure that the PCAs were showing up for work and turning in accurate timesheets.  Id. at 33:1-13.  According to Nnawuba, the Director of Nursing essentially "r[a]n the company."  Id. at 32:7.  The Director of Case Management, who was Florence Nguh at the time of the audit, had a similar level of responsibility over patients enrolled in the Medicare Waiver plan.  Id. at 33:13-35:4.  When asked about the lack of signed plans of care and the overbilling, Nnawuba claimed that she could not testify about it, but that the FBI would have to ask "[t]he people in charge" – namely, Nguh or Adebusoye.  Id. at 48:8-49:6.

Based on the results of the various audits, DHCF moved to terminate Speqtrum as a PCA provider and to recoup over $8 million dollars in District funds implicated by the fraud.  See DHCF Notice of Termination of Provider Agreement at 1; DHCF Notice of Overpayment Recovery at l.

On December 13, 2010, the federal Government filed this case alleging that Defendant had knowingly submitted false invoices to the D.C. Medicaid Program in violation of the False

Claims Act, thereby defrauding the United States of $1,840,724.92.  31 U.S.C § 3729; see Compl. at 11-13.

In connection with its Complaint, the Government moved for preliminary injunctive relief to recover funds improperly paid to Speqtrum.  That relief was granted, and the District was ordered to freeze certain Medicaid funds it had recouped from Speqtrum until the case could be tried.  See ECF No. 13 (Order Granting PI) at 6.  Since that time, the Court has ordered and then vacated an entry of default against Speqtrum, see ECF No. 30 (Order Vacating Default) at 3, and granted partial summary judgment to the Government, thereby denying Speqtrum's assertion of an Equal Protection defense.  See ECF No. 56 (Memorandum Opinion and Order Striking Equal Protection Defense).  The Government has moved for summary judgment, and Defendant has cross-moved.  The Court now turns to those Motions.

**II.      Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

In light of this requirement, and pursuant to Local Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-judgment motions, "assume[s] that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). These rules "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict compliance with the . . . rule[s] is justified both by the nature of summary judgment and by the rule[s'] purposes . . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material,

distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." Id. at 150-51 (quoting Gardels v. CIA, 637 F.2d 770, 773 (D.C. Cir. 1980)).

The Government argues that Speqtrum has failed to comply with this requirement, as its Response to Plaintiff's Statement of Purported Undisputed Material Facts is inadequate. The Government is, for the most part, correct. Called on to answer the Government's detailed and well-supported Statement of Facts – which cites FBI Agent Domroe's Declaration as well as sixteen additional exhibits – Speqtrum has filed only the most cursory of responses. In its Response, Speqtrum generally fails to cite to any record evidence whatsoever, preferring to baldly assert its version of the story. If Defendant cites any outside document, it generally refers to its Answer to the Complaint – which is not evidence – or to an attachment to that Answer that the Court has already deemed irrelevant. See ECF No. 56 (Memorandum Opinion and Order Striking Equal Protection Defense) at 6. As Speqtrum "fails to cite specific record support for a number of assertions included in its Statement," the Court will deem most of the Government's facts admitted. See Valles-Hall v. Ctr. for Nonprofit Advancement, 481 F. Supp. 2d 118, 123-24 (D.D.C. 2007); see also Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324. This includes evidence that might otherwise be excluded as hearsay – for example, an FBI agent's account of his conversation with a witness – because Defendant has failed to raise any hearsay objections. See Diaz v. United States, 223 U.S. 442, 450 (1912) ("when [hearsay] is admitted without objection, it is to be considered and given its natural probative effect as if it were in law admissible"); NLRB v. Int'l Union of Operating Engineers, Local Union No. 12, 413 F.2d 705, 707 (9th Cir. 1969) ("Unobjected to hearsay is admissible and of probative value in the district courts."). In addition, the Court cannot credit – even at the summary-judgment stage –

Defendant's bare assertions about any incidents not specifically pled and supported with record evidence.

Speqtrum does, however, offer <u>some</u> of its own evidence – for the first time – in its Reply to the Government's Opposition to its Cross-Motion for Summary Judgment. Despite the fact that Defendant offered these scraps of evidence late in the game, the Court will take them into account. The Court, however, will also consider the Government's Surreply in response, as well as the subsequent and related briefing by both parties. Cf. <u>Flynn v. Veazey Const. Corp.</u>, 310 F. Supp. 2d 186, 189 (D.D.C. 2004) ("If the movant raises arguments for the first time in his reply . . .[,] the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments . . . .").

## III. Analysis

The sole dispute to be resolved at the summary-judgment stage is the validity of the Government's False Claims Act allegations. The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." <u>United States v. Neifert-White Co.</u>, 390 U.S. 228, 232 (1968); <u>see also</u> <u>United States ex rel. Lemmon v. Envirocare of Utah, Inc.</u>, 614 F.3d 1163, 1167 (10th Cir. 2010) ("The FCA 'covers all fraudulent attempts to cause the government to pay out sums of money.'"). Under the False Claims Act, a provider may be liable if it "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a <u>false or fraudulent claim</u> for payment or approval" or "(2) knowingly makes, uses, or causes to be made or used, <u>a false record or statement</u> to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)-(2). (emphasis added). This broad standard has enabled the FCA to become one of the Government's principal tools in combating Medicaid and Medicare fraud. According to the

Department of Justice, over two-thirds of the funds recovered under the Act last year – that is, $2.6 billion out of a total of $3.8 billion recouped – stem from healthcare fraud.  See Press Release, Dep't of Justice, Justice Department Recovers $3.8 Billion from False Claims Act Cases in Fiscal Year 2013 (Dec. 20, 2013), available at http://goo.gl/V2cNqR.

To prove a "false claim" violation, the Government generally must show that "(1) defendant submitted a claim to the government; (2) which was false; and (3) which the defendant knew was false."  United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 57 (D.D.C. 2007) (internal quotation marks omitted).  To prove a "false statement" violation, the Government must prove that Speqtrum made or used a (1) "false record or statement," (2) which Defendant knew to be false, (3) "to get" the "claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2).  The Court will analyze each element of each cause of action in turn.

A.  False Claims

1.  *Submitted Claim to Government*

Under the FCA, a "claim" is defined broadly as "any request or demand, whether under a contract or otherwise, for money or property."  Id.  § 3729(c).  It includes requests "made to a contractor, grantee, or other recipient" – such as the District government – "if the United States Government provides any portion of the money" or "will reimburse [the] contractor, grantee, or other recipient for any portion of the money" requested by the provider.  Id.

Because state Medicaid expenditures are, in part, reimbursed by the federal government, "Medicaid claims submitted to a state are . . . 'claims' to the federal government under the FCA."  United States v. Rogan, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006); United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 493 (D.C. Cir. 2004) (Pre-2009, liability would

13

"attach if the Government provides the funds to [a] grantee" like Medicaid "upon presentment of a claim to the Government."). Each request for payment that Speqtrum submitted to D.C., then, qualifies as an FCA "claim."

   2. *Falsity*

There are three ways in which a claim for payment can be false. First, a claim can be factually false if it "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." United States v. Science Applications Intern. Corp. (SAIC), 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001)). Next, a claim can be false if the request for payment itself expressly, yet falsely, certifies "compliance with an applicable federal statute, federal regulation, or contractual term." Id. Finally, a claim may be false if it impliedly certifies compliance with an applicable regulation or contractual provision. In other words, implied certification occurs when the provider requests payment and remains silent as to its non-compliance with a term or regulation that "was a prerequisite to the government [payment] sought." Id. (quoting United States ex. rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000)).

The Government alleges that Speqtrum made two different types of false claims: (i) claims for services that Speqtrum did not render and (ii) claims for services that Speqtrum purportedly rendered, but which were out of compliance with various D.C. regulatory requirements. The first set of claims fits neatly into the "factually false" category, while the remaining ones must rely on a false-certification theory to succeed.

   a. Factually False Claims

To begin with, the Government contends that Speqtrum submitted a number of claims that were factually false – that is, invoices or bills for services that the agency never actually

provided. Such claims are "paradigmatic" violations of the False Claims Act. <u>Id.</u>; <u>see also, e.g.</u>, <u>Mikes</u>, 274 F.3d at 697; <u>United States v. Krizek</u>, 859 F. Supp. 5, 12 (D.D.C. 1994) (psychiatrist billed for more hours than he could possibly have worked in single day); S. Rep. No. 99-345, at 9, <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266, 5274 ("a false claim may take many forms, the most common being a claim for goods or services not provided"); Robert Fabrikant & Glenn E. Solomon, <u>Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry</u>, 51 Ala. L. Rev. 105, 111-12 (1999) ("a claim may be false because it seeks reimbursement for services or goods not provided").

Here, the Government's evidence reveals several instances in which D.C. Medicaid was billed for services that Speqtrum's PCAs never provided. Thus, the actual claim or bill submitted to D.C. and forwarded to the Government was itself factually false. In many cases, FBI agents found – based on interviews with clients – that Speqtrum was billing for more hours per week than PCAs actually worked. <u>See, e.g.</u>, Domroe Decl., ¶¶ 10, 20, 24-27. Speqtrum was also billing for at least two clients that had never received any services from Speqtrum at all. <u>See id.</u>, ¶¶ 22-23, 29-30; <u>see also id.</u>, ¶13. According to DHCF, moreover, one client was deceased when services were billed under his name. <u>See</u> DHCF Notice of Termination of Provider Agreement at 2.

This is the classic case of false claims being presented to acquire undeserved funds. Because Speqtrum presents no evidence to contradict any of the Government's assertions regarding the falsity of the specified claims, the Court must take it as given that Defendant did, in fact, submit the fraudulent claims outlined above.

b.   Falsely Certified Claims

In addition, the Government avers that Speqtrum submitted claims that falsely certified "compliance with an applicable . . . statute, . . . regulation, or contractual term" that was material to Medicaid's decision to pay.  SAIC, 626 F.3d at 1266.  Plaintiff does not assert that Defendant expressly certified compliance with the relevant regulations in its various reimbursement requests.  That is, no one claims that the bills or invoices submitted to D.C. contained explicit statements that Speqtrum was in compliance with all the relevant regulations.  The Government, accordingly, must be proceeding under an "implied" certification theory, which does not require Defendant to submit factually or expressly false claims to the Government.

"An implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal" – or, in the case of Medicaid, state-based – "rules that are a precondition to payment."  Mikes, 274 F.3d at 699.  "[I]mplied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment."  SAIC, 626 F.3d at 1270 (quoting Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).  Put another way, if a provider is asking for payment, it is fair to assume that she has done everything necessary to merit reimbursement.  If she has not, there is a problem.

"[T]o establish the existence of a 'false or fraudulent' claim on the basis of implied certification of a contractual" or regulatory "condition, the FCA plaintiff – here[,] the [G]overnment – must show that the contractor withheld information about its noncompliance with material contractual" or regulatory "requirements."  Id. at 1269.  With its Motion for Summary Judgment, the Government has included plenty of evidence showing that Speqtrum

violated various regulatory requirements.  To begin with, according to D.C. law, each PCA

patient's file must contain a plan of care that "specif[ies] the frequency, duration[,] and expected

outcome of the services rendered" and is approved and "signed by the physician within thirty

(30) days of prescription."  D.C. Mun. Regs., tit. 29, §§ 5006.3, 5006.6.  Yet many Speqtrum

files lacked a plan of care, contained unsigned plans of care, or contained plans of care with

forged physician signatures.  See Domroe Decl., ¶¶ 8, 12, 15-16; FBI Doctor Interviews.  In

addition, each patient's file must contain a "[d]escription and dates of services rendered,

including the name of the personal care aide performing the service."  D.C. Mun. Regs., tit. 29,

§ 5007.8(c).  Some of Speqtrum's files, however, lacked the requisite timesheets, and other

evidence indicated that timesheets that were included in files may have been forged.  See

Domroe Decl., ¶ 9; Pre-Filled Timesheets.  Again, Speqtrum has adduced no evidence to

contradict any of these allegations, so the Court takes the facts as conceded.

　　　The Government, however, cannot win the day simply by claiming that Speqtrum

violated any of the many regulatory obligations placed on it by D.C. law.  Rather, the

requirement violated must be material to the Government's decision to pay.  That is, Plaintiff

must show that, had the Government known about Speqtrum's non-compliance, it might not

have paid Speqtrum for its services.  See Lemmon, 614 F.3d at 1169 ("[F]alse certification –

regardless of whether it is implied or express – is actionable under the FCA only if it leads the

government to make a payment which, absent the falsity, it may not have made.").  This is

particularly important in the Medicaid and Medicare context, where providers face an abundance

of regulations, some of which may be more vital to the Government's payment decision than

others.  For example, if compliance with every D.C. regulation were essential, a provider could

be charged under the Act for something as innocuous as having a policy manual that was not

entirely up to snuff or failing to update its "organizational chart." D.C. Mun. Regs., tit. 29, § 5002.

For that reason, Medicaid and Medicare cases distinguish between conditions of <u>payment</u> – which are material contractual terms or regulations – and conditions of <u>participation</u> in the federally funded program, which are not. <u>See, e.g.</u>, <u>Mikes</u>, 274 F.3d at 701-02; Fabrikant & Solomon, *supra*, at 122-24. In <u>Mikes</u>, for example, the Second Circuit distinguished between the requirement that services under Medicare be "reasonable and necessary" – which was an express condition of payment – and the requirement that services comply with a certain "standard of care" – which was not, although repeated failures could ultimately lead to a provider's removal from the program. 274 F.3d at 701-702. The key point here is that FCA liability is not triggered every time a doctor or nurse allegedly fails to comply with even the most minor American Medical Association guideline.

The Government, then, must establish that it might not have paid Speqtrum had it known of the provider's faulty files. <u>See</u> <u>Lemmon</u>, 614 F.3d at 1169. That it has not done. According to Plaintiff, the D.C. Code establishes that having all the required documentation in a patient's file is material to the District's decision to pay. The Code, however, is quite specific about what is required for payment, and an up-to-code patient file is not one of those requirements. <u>See</u> D.C. Mun. Regs., tit. 29, § 5009. To be sure, the District may deny payment if a provider "[k]nowingly and willfully made or caused to be made any false statement or misrepresentation of <u>material</u> fact in" requesting payment. <u>Id.</u> § 1301.2(a) (emphasis added). But that does no more than frame the question: which facts and regulations are material? In addition, a provider's Medicaid contract may be terminated if it "[f]ail[s] to furnish requested information," such as

documentation necessary to determine whether and how much the provider should be paid.  Id. §
1302.1(d).  But that is a condition of participation, not a condition of payment for each claim.

To be fair, Speqtrum's contract with the District is slightly more specific.  In a section
labeled "Sanctions for Non-Compliance," the District states that "[i]f the Department determines
that a provider has failed to comply with the applicable Federal or District law or rule . . ., the
Department may do all of the following," including "[w]ithhold all or part of the providers'
payments" and "[t]erminate the agreement."  Mot., Exh. 1 (Medicaid Provider Agreement) at 17.
As Speqtrum points out, however, it is not entirely clear what violations actually lead to non-
payment – for example, it is highly doubtful that the District ever denies payment on the basis of
a provider's use of an outdated organizational chart, even if it could conceivably do so.  As a
counterpoint, the Government notes that the District did, in fact, seek to recoup a large amount of
Medicaid funds from Speqtrum based on its faulty files.  See DHCF Notice of Overpayment
Recovery at l.  The Court is thus convinced that at least some of the implied-certification
breaches were likely material.  Because the Government does not attach documentation
explaining which of the 208 files flagged by DHCF caused the District itself to revoke payment
and why, however, the Government is not entitled to judgment as a matter of law on all of those
claims.  Rather, it will have to prove at trial which of the 208 potential implied-certification
violations were material to payment.

### 3. Scienter

The Court now turns to the final element of a "false claim" violation: *scienter*.  False
claims must be made "knowingly" to be actionable.  This occurs if the provider "(1) has actual
knowledge of the [false] information; (2) acts in deliberate ignorance of the truth or falsity of the
information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C.

§ 3729(b).  This standard is quite broad and does not require intent to defraud.  Id.  Rather,

"deliberate ignorance" or "reckless disregard" may suffice.  Id.

The Court first considers *scienter* with respect to the factually false claims – that is, the

overbilled hours and other services not rendered.  The Government has presented evidence that

high-level Speqtrum employees had actual knowledge of the falsity of those claims.  See, e.g.,

Ahouste Memo at 1 (Director of Nursing was intentionally billing for services not rendered);

Gabriel Interview at 2-3 (Nurse Director of Case Management knew PCAs were billing for

services not rendered).  As a defense, Speqtrum claims that these executives were "rogue

employees."  Defendant, however, presents nothing to rebut the Government's evidence that

those employees, including Tingem, Nguh, and Adebusoye, were acting within the scope of their

employment as they billed for Medicaid services under Speqtrum's name.  Cf. United States v.

O'Connell, 890 F.2d 563, 569 (1st Cir. 1989) ("a corporation should be held liable under the

False Claims Act for the fraud of an agent who acts with apparent authority even if the

corporation received no benefit from the agent's fraud").  Even if these women were somehow

acting solely of their own accord, the company would still be liable because its President,

Nnawuba, acted "in deliberate ignorance of the truth or falsity of" Speqtrum's claims or, at a

minimum, acted with "reckless disregard."  After learning that Tingem had been committing

rampant fraud in 2008, Nnawuba did nothing to clean up the books or to identify the fraudulent

files.  She knew they were there, as a document from Speqtrum's office indicates.  See Ahouste

Memo at 1.  But she did nothing about the fraud other than to let Tingem go.  Nor did she

investigate for any further evidence of corruption – even though Tingem had hiring authority and

(naturally) brought on other employees like Nguh who, as it turned out, continued employing her

methods.  See Nnawuba Depo. at 82:3-5; Florence Nguh Termination Letter at 1-2.  Nnawuba

knew that at least one high-level Speqtrum employee had committed Medicaid fraud; she cannot now claim anything other than "deliberate ignorance" of the fact that such fraud resulted in false claims to Medicaid.

The same basic logic applies to the implied-certification claims for faulty, missing, or forged paperwork. To establish *scienter* for an implied-certification claim, the Government must prove Defendant knew both "(1) that it violated a contractual obligation" or regulation, and "(2) that its compliance with that obligation was material to the government's decision to pay." SAIC, 626 F.3d at 1269. As to knowledge of the contractual violation, the Government has proffered sufficient evidence. Many high-level employees knew that patients had no plan of care in place, and the topic was discussed at staff meetings. See Gabriel Interview at 1-2. Before audits, moreover, those same employees would deliberately "clean up" files that they no doubt knew were faulty. See Browne Interview at 1-3. One employee averred that Nnawuba was also aware of these problems. See Gabriel Interview at 1. Even if she was not, her conduct exhibits reckless disregard or deliberate ignorance of the company's non-compliance. The vast majority of Speqtrum's files had obvious deficiencies, and even a cursory inspection of some files would have revealed that fact. See Domroe Decl., ¶ 17 (listing various problems with 208 out of 220 examined files).

Whether Speqtrum knew that compliance with the relevant regulations was "material" to payment, though, is another question. The Government has not provided enough evidence of awareness of materiality for each of the various implied-certification claims to merit judgment as a matter of law – particularly where the Court has found that materiality itself remains in dispute. Conversely, the fact that the files were "cleaned up" before auditing does suggest an awareness that certain paperwork-centered regulations may have been material to payment, see Browne

Interview at 1-3, as does the language in Speqtrum's Medicaid contract. See Medicaid Provider Agreement at 17. Therefore, summary judgment in Speqtrum's favor is not warranted either. The question of *scienter* on those particular claims, accordingly, will be left to the finder of fact.

* * *

In sum, then, the Government has proved that it is entitled to summary judgment as to its claims of overbilling and billing for services not rendered. On that front, Plaintiff has submitted uncontroverted evidence that Speqtrum knowingly requested payment for services it had not, in fact, provided. The Government has not, however, submitted sufficient evidence to merit summary judgment on its implied-certification claims regarding faulty paperwork. It has, though, mustered enough evidence to overcome Speqtrum's Cross-Motion and to go to trial on those claims.

B. False Records or Statements

The Government claims that Speqtrum has violated an additional provision of the FCA. It argues that Defendant "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (emphasis added). Plaintiff's argument on this front consists of a single sentence stating that "every claim that forms the basis of this Complaint is comprised of a 'false statement' or record." Pl. Mot. at 6. That, of course, is not true. Omitting a plan of care from a file does not constitute making a "false record or statement." An omission is no statement at all, and it is certainly not a false record. See, e.g., SAIC, 626 F.3d at 1267; United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266-67 (9th Cir. 1996). The only acts, then, that could be encompassed by a false-records or -statements claim are (a) the false statements made regarding hours worked and services provided and (b) any falsified plans of care or timesheets. As a result,

all of the allegations the Government makes under the "false statements" prong of the Act would seemingly also be covered by the "false claims" prong.  The Government may thus be advised to consider whether this part if its suit is actually beneficial to its cause, rather than cumulative and potentially confusing to the factfinder.  The Court, in any event, will not linger over the issue.

### 1. *Falsification*

As explained above, the Government has adduced uncontested evidence showing that Speqtrum falsified reports and claims relating to hours worked and services provided.  In addition, it forged physicians' signatures and hence created fraudulent plans of care.  See *supra*, § III.A.2.  These false records may be actionable even if they were never actually presented to the Government along with Speqtrum's request for payment.  See Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 671 (2008) ("What [the Act] demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the Government.") (internal quotation marks omitted); United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 192 (5th Cir. 2009) (false-records or -statements claim need not allege that record itself was submitted to government).

### 2. *Scienter*

As explained previously, Speqtrum did this knowingly, as the term is defined in the FCA. See *supra*, § III.A.3.

### 3. *Get Claim Paid/Materiality*

The Government has not necessarily shown, however, that Speqtrum falsified its records "to get a false or fraudulent claim paid or approved by the [federal] Government."  31 U.S.C. § 3729(a)(2).  It is likely self-evident that the overbilling was done for the purpose of getting the

claim approved by the federal Government, since D.C. can only pay its providers to the extent that it is reimbursed by the U.S. Government.  In other words, because claims made to D.C. Medicaid are "forwarded to the Government" for partial reimbursement, any bills submitted for services not rendered would meet this requirement.  See Allison Engine Co., 553 U.S. at 670 n.1. It is, nonetheless, unclear whether the other forged paperwork was created "to get" the "claim[s] paid" by the Government or simply to feign compliance with local regulations unrelated to payment.  See supra, § III.A.2.  In essence, this is the same problem the Government faced with respect to materiality under the "false claims" prong of the Act.

Indeed, the 2009 version of the Act replaces the "to get a false or fraudulent claim paid" requirement with an explicit materiality requirement.  And that updated language on materiality may govern some of the claims at issue here, since Congress directed that the materiality requirement apply retroactively to claims (that is, presumably, claims for payment) pending as of June 2008.  See Fraud Enforcement and Recovery Act of 2009, § 4(f), Pub. L. No. 111-21, 123 Stat. at 1625.  As far as the Court can tell, however, the issue plaguing the Government here would remain even under the revised Act.  See 31 U.S.C. § 3729(a)(1)(B) (2012) (liable when "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim") (emphasis added); id. § 3729(b)(4) ("the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"); but see Allison Engine Co., 553 U.S. at 670 (requiring a slightly more burdensome standard pre-2009).  Either way, the Government must show that the false record was "material" or made "to get" the claim paid.

* * *

Under this second "false statement" theory of liability, therefore, the Government is also entitled to summary judgment regarding services never rendered. Its claims related to forged paperwork, however, must proceed to trial because it is unclear whether complete records are material to the Government's payment decision.

C. Damages

To prove a False Claims Act violation, a Plaintiff need not specifically plead or prove damages. See United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 199 (D.C. Cir. 1995). The Government, nevertheless, does claim that it has suffered extensive damages in this case. It thus offers some evidence that it has suffered damages in each instance of fraud – namely, a declaration from FBI Agent Domroe, who has been through all the files and calculated the damages. See Domroe Decl., ¶¶ 17, 30. It is not entirely clear from the declaration, however, which damages stem from violations that are undoubtedly actionable and material – such as billing for services not provided – and which stem from regulatory violations whose materiality is still in dispute. Domroe's declarations, moreover, do not make clear how the damages were calculated; rather, with the exception of a few fleshed-out examples, they simply state the amount of funds the Government believes it has lost. As a result, Speqtrum quarrels with the Government's calculations. Since the Government has not produced evidence that would necessarily convince a reasonable jury that it is entitled to the full sum that it desires, the question of damages will also be reserved for trial.

D. Defenses

Other than Speqtrum's argument regarding its "rogue employees," the company raises only a few scattershot defenses that were all made with almost no reference to either governing law or relevant evidence. First, Speqtrum objects to certain pieces of the Government's evidence

as unauthenticated.  See Fed. R. Evid. 901.  Any document requiring authentication, however, has been vouched for by Agent Domroe.  See Pl. Reply, Attach. 2 (Supplemental Declaration of Gregg C. Domroe), ¶¶ 3-11.  In addition, Speqtrum decries its inability to cross-examine witnesses.  This is not a proper objection on summary judgment, particularly where discovery has closed and Defendant has not raised any dispute of material fact.

Speqtrum also claims that DHCF did not in practice require plans of care to be signed by a physician within 30 days of prescription, but its scant evidence shows no such thing.  See ECF No. 16-2 (document from another local agency regarding non-Medicaid provider's compliance with regulations irrelevant to present litigation); Def. Reply, Exh. 2 (Action Steps for Early PA Number Release) at 3 (DHCF document allowing providers to submit clinical information and other documents within 30 days of receiving "Prior Authorization," but still requiring full documentation and compliance with law).  Similarly, Defendant claims that it has not yet received payment from Medicaid for each of the patients at issue, but this is also without support (and beside the point, given that the Court is not now determining damages).  Finally, Speqtrum objects that the Government's damage calculation uses "gross" rather than "net" damages.  That is, Plaintiff failed to subtract from its gross damages the value of services Speqtrum actually rendered to the Government.  This objection seems to be foreclosed by D.C. Circuit precedent stating that services rendered to a third party are of no value to the Government at all.  See SAIC, 626 F.3d at 1279 ("In some cases, such as where the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages."); United States v. Rogan, 517 F.3d 449, 453 (7th Cir. 2008) (defendant who submitted false Medicaid claims was required to repay full

amount because he "did not furnish any medical service to the United States"). As with the other damages issues, however, the Court will reserve judgment until trial.

**IV.     Conclusion**

For the foregoing reasons, the Court concludes that the Government is entitled to summary judgment as to the allegations of overbilling and charging for services not rendered. Plaintiff has thus established partial liability. All other claims, along with the issue of damages, must proceed to trial. The Court will therefore grant the Government's Motion for Summary Judgment in part and deny it in part. Defendant's Cross-Motion for Summary Judgment will be denied. A separate Order consistent with this Opinion will be issued this day.

  /s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  June 13, 2014