**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

        **v.**                                          **Civil Action No. 10-2111 (JEB)**

**SPEQTRUM, INC.,**
**d/b/a Speqtrum Health Care Services,**

    **Defendant.**

---

**MEMORANDUM OPINION**

Defendant Speqtrum, Inc., is a home-healthcare agency that furnishes the elderly and

disabled with assistance in their day-to-day activities.  From 2004 to 2009, D.C. Medicaid, which

is subsidized by the federal Medicaid program, reimbursed many of the agency's services for

low-income patients.  Over the years, unfortunately, Speqtrum began playing fast and loose with

Government funds: overbilling for hours not worked, charging the District for clients it did not

service, forging physician signatures on its paperwork, and failing to obtain medical

authorization prior to rendering services.  The District uncovered this massive fraud during a

routine audit in early 2009.  The federal Government began its own investigation shortly

thereafter, and this lawsuit – alleging violations of the federal False Claims Act – followed.

After the parties cross-moved for summary judgment, this Court issued a lengthy Opinion

granting the Government's Motion in part and denying Speqtrum's in full.  See United States v.

Speqtrum, Inc. (Speqtrum I), 47 F. Supp. 3d 81 (D.D.C. 2014).  More specifically, it held

Defendant liable insofar as it had billed Medicaid for services never rendered, but reserved

judgment on the other species of fraud alleged by Plaintiff.  See id. at 97.  Indicating the need for

additional evidence, it also refrained from resolving the question of damages.  See id.

      The Government has now augmented its submissions and renewed its request for

summary judgment on the remaining issues.  Finding judgment warranted as to liability but not

damages, the Court will grant its Motion in part and deny it in part.

## I.      Background

      The Court has already described much of the relevant background of this case in its prior

Opinion.  See id. at 84-88.  It therefore recites only the basic underlying facts here and sets out

more detail where relevant in the subsequent analysis.  See Section III, *infra*.  In so doing, the

Court is aware that, on a motion for summary judgment, it must view the facts in the light most

favorable to the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

(1986).  In this case, however, because Speqtrum has failed to produce any affidavits,

declarations, or deposition transcripts – or any other relevant evidence that could be considered

at this stage – the Court, as in its prior Opinion, must treat the vast majority of the facts offered

by the Government as conceded.  The picture that emerges of Defendant's business is, to say the

least, quite unflattering.

### A.  Medicaid Framework

      Established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*,

Medicaid is a joint state-federal program that subsidizes healthcare for "low-income persons who

are age 65 or over, blind, disabled, or members of families with dependent children," as well as

pregnant women and children.  See 42 C.F.R. § 430.0; About Us, Medicaid.gov,

http://www.medicaid.gov/About-Us/About-Us.html (last visited June 17, 2015).  Each state is

responsible for administering its own Medicaid program, with the federal Government chipping

in to cover some portion of expenditures.  See Alison Mitchell *et al.*, Cong. Research Serv.,

R43357, Medicaid: An Overview 32 (2014).  The District of Columbia's Medicaid Program, for

instance, receives roughly 70 percent of its funding from the federal Government.  See id. at 35.

 Among other benefits, D.C. Medicaid covers the provision of personal-care services to

eligible recipients.  See D.C. Mun. Regs., tit. 29, § 5000;[1] see also Medicaid Long-Term Care

Services, LongTermCare.gov, http://goo.gl/VtK8Sp (last visited June 17, 2015).  The objective

of such services is "[t]o provide necessary hands-on personal care assistance with the activities

of daily living" for seniors and others struggling to live independently, and "[t]o encourage

home-based care as a preferred and cost-effective alternative to institutional care."  D.C. Mun.

Regs., tit. 29, § 5000.2.

 To qualify for D.C. Medicaid funding, providers of personal-care services and their

patients must clear several hurdles.  Patients must first obtain a prescription and referral for such

services from a medical professional, based on a finding that they "have functional limitations in

one or more activities of daily living" – *e.g.*, bathing, dressing, or administering vital

medications – "for which personal care services are needed."  Id. §§ 5004.1, 5005.1.  Upon

receiving a referral for services, the provider must conduct an "initial assessment" of "the

patient's functional status and needs," and draw up a "plan of care" for delivery of services.  See

id. §§ 5006.1-5006.2.  Those plans must "specify the frequency, duration[,] and expected

outcome of the services rendered," and they must be approved and signed by "the patient's

physician or advanced practice registered nurse."  Id. §§ 5006.3, 5006.6.  A registered nurse

must review the plan every 62 days, and any "update[] or modifi[cation]" must be signed by the

physician.  Id. § 5006.6.  In addition, all services must be reauthorized by a physician or

---

[1] All references are to the 2006 version of the D.C. Code, which was in force at the time of Speqtrum's alleged conduct.

advanced-practice registered nurse every six months.  See id. § 5006.4.  All licensed providers,

furthermore, are required to "maintain accurate records reflecting the specific personal care

services provided to each patient."  Id. § 5007.2.

      B.  Relevant Conduct

      Speqtrum, a home-healthcare agency, provided personal-care services to Medicaid-

eligible patients located in the District beginning in 2004.  See Pl. First MSJ, Exh. 1 (Speqtrum's

Medicaid Provider Agreement).  In May and June of 2009, the Department of Health Care

Finance – which is responsible for D.C. Medicaid compliance – conducted a routine audit of

Speqtrum's office.  See Speqtrum I, 47 F. Supp. 3d at 85.  The results were staggering: after

reviewing the records of 220 randomly selected Medicaid beneficiaries, DHCF discovered that

208 files "lacked the documentation required to legitimatize the services allegedly rendered."  Id.

at 86.  Indeed, "[s]ome files had no plan of care, or the plan of care had gone unsigned," other

plans of care bore forged signatures, and still other files lacked adequate timekeeping records.

See id.  Some files, moreover, revealed billing for aid never rendered – e.g., invoices for services

purportedly provided to long-deceased patients.  A follow-up audit by the FBI and other federal

agencies uncovered similar irregularities: fifteen of twenty randomly selected files contained

fraudulent claims, according to interviews with the patients themselves.  See id.

      On July 15, 2009, the FBI executed a search warrant and seized piles of documents from

Speqtrum's D.C. and Maryland offices.  See id.  The documents collected further confirmed the

existence of foul play – for example, one document appeared to contain various trial runs at

forging a doctor's signature.  See id.  As a result of the audits and investigation, DHCF

terminated Speqtrum as a personal-services provider.  See id. at 87.

C.  Procedural History

In short order, the federal Government filed this suit under the False Claims Act, 31

U.S.C § 3729, accusing Speqtrum of bilking the United States out of $1,840,724.92.  See id.[2]  It

charged Defendant with a pattern of fraud encompassing both (i) requesting payment for services

not rendered (e.g., services allegedly provided to dead or hospitalized patients) and (ii)

withholding information about its noncompliance with key regulatory requirements (e.g., the

plan-of-care deficiencies) while seeking reimbursement.  See id. at 85.  After some procedural

wrangling – which, thankfully, the Court need not recount at this juncture – the Government

moved for summary judgment on both liability and damages.  Speqtrum opposed and cross-

moved.

On June 13, 2014, the Court issued an Opinion granting the Government's Motion in part

and denying Speqtrum's in its entirety.  As to the first type of alleged fraud, the Court found that

Plaintiff had submitted "uncontroverted evidence that Speqtrum knowingly requested payment

for services it had not, in fact, provided," and that such misconduct constitutes a "paradigmatic"

violation of the False Claims Act.  See id. at 91, 95 ("This is the classic case of false claims

being presented to acquire undeserved funds.").  It thus held the Government "entitled to

summary judgment as to its [allegations] of overbilling and billing for services not rendered."

Id. at 95.

The Opinion reserved judgment, however, on the second type of fraud asserted – namely,

Speqtrum's withholding of information related to its regulatory noncompliance.  Although the

---

[2] Like its initial Motion, the Government's renewed Motion cites the current version of the False Claims Act.  As the Court explained in its prior Opinion, see Speqtrum I, 47 F. Supp. 3d at 85 n.2, the fraudulent activities at issue in this case occurred almost entirely when a prior version of the Act – which was amended on May 20, 2009 – was in effect.  See Fraud Enforcement and Recovery Act of 2009, § 4, Pub. L. No. 111-21, 123 Stat. 1617, 1621-25 (2009).  The Court is not aware of any substantive difference between the two versions that would affect the disposition of the present Motion.  In the interests of fidelity and precision, however, it will again rely on the pre-2009 version in this Opinion.

Government had "mustered enough evidence to overcome Speqtrum's Cross-Motion and to go to trial on those claims," the Court found that it had not submitted sufficient evidence to merit summary judgment in its favor.  See id.  It similarly found the Government's request for damages premature.  See id.

The Court subsequently stayed the case so that a concurrent administrative proceeding held by DHCF could progress to an evidentiary hearing.  See September 25, 2014, Minute Order. Although that hearing was initially scheduled for December 2014, Speqtrum's failure to properly submit its exhibits caused the hearing to be repeatedly postponed, and it was ultimately canceled. See ECF No. 95 (February 26, 2015, Status Report), Exh. 1 (Order of Administrative Court).  As a result, the Court lifted the stay and allowed the Government to renew its Motion for Summary Judgment on those issues left open after the Court's prior decision.  See March 6, 2015, Minute Order.  It is to that submission – and the Government's accompanying declaration – that the Court now turns.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson, 477 U.S. at 247-48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

## III.    Analysis

Before resolving the substantive questions raised by the Government's renewed Motion, the Court must attend to two preliminary issues: Speqtrum's wholesale mischaracterization of the prior Opinion and its flawed response to the Government's Statement of Facts. After clearing away this underbrush, the Court will turn to the United States's principal contention – namely, that Speqtrum violated the False Claims Act by withholding information about its non-

compliance with a key regulatory requirement.  It concludes by addressing the question of damages.

A.   Portrayal of Prior Opinion

In a triumph of brazenness over wisdom, Speqtrum flagrantly misrepresents the Court's prior rulings – and not just once.  Perhaps most egregiously, it characterizes the previous Opinion as decided largely in its favor.  See, e.g., Opp. at 1 (stating that Opinion "dismisses almost all [the Government's] claims" as well as its request for $1.8 million in damages); id. at 2 ("Plaintiff now seeks summary judgment on the remaining few claims . . . not dismissed by the Court's June 13, 2014, Order.").  This, of course, is not even remotely true; quite the opposite, in fact.  The Court expressly denied Speqtrum's Cross-Motion for Summary Judgment in toto, finding that Defendant had failed to contradict each and every claim asserted by the United States.  See Speqtrum I, 47 F. Supp. 3d at 84.  Indeed, as explained above, see Part I.C, supra, the Court's prior Opinion granted in part the Government's Motion and reserved judgment on all remaining issues.

In like fashion, Speqtrum maintains that the Court has already deemed the particular claims at issue in this renewed Motion for Summary Judgment – i.e., the Government's plan-of-care allegations – non-actionable under the FCA.  Opp. at 2, 13-15.  Yet the Opinion did no such thing.  Rather, it found that such claims might well be meritorious, but that additional evidence would be necessary to arrive at a definitive conclusion.  See Speqtrum I, 47 F. Supp. 3d at 95.  Having augmented its submissions, the Government thus properly renews its request for judgment on those allegations.

Ipse dixit cannot spin fiction into fact.  Defendant's audacious mischaracterization of the Court's prior rulings – presumably as a litigation tactic – is deeply troubling.  This suit, after all,

is premised on allegations that Speqtrum engaged in a pattern of deceitful and misleading

conduct.  To parry such charges with outright falsity – about the Court's own Opinion – defies

belief.  Although such admonition should hardly be necessary, Defendant is advised to comport

with the basic duty of candor towards this tribunal in all future filings.

      B.   <u>Statement of Genuine Issues – Or Lack Thereof</u>

The missteps in Speqtrum's briefing, unfortunately, do not end there.  Under Federal

Rule of Civil Procedure 56, a party seeking to oppose summary judgment is required "to go

beyond the pleadings and by [its] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, . . . designate specific facts showing that there is a

genuine issue for trial."  <u>Celotex Corp.</u>, 477 U.S. at 330 (internal quotation marks omitted); <u>see</u>

Fed. R. Civ. P. 56(c).  To implement that instruction, the District's Local Rules require that an

opposition to a motion for summary judgment be accompanied by a "<u>separate</u> concise statement

of genuine issues setting forth all material facts as to which it is contended there exists a genuine

issue necessary to be litigated."  LCvR 7(h) (emphasis added).  Such statement "shall include

references to the parts of the record relied on to support" the assertions therein.  <u>Id.</u>  This rule

"places the burden on the parties and their counsel, who are most familiar with the litigation and

the record, to crystallize for the district court the material facts and relevant portions of the

record."  <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 101 F.3d 145, 151 (D.C.

Cir. 1996).

In its prior Opinion, the Court took Defendant to task for violating these rules.  <u>See</u>

<u>Speqtrum I</u>, 47 F. Supp. 3d at 89 (noting the "cursory" nature of Speqtrum's Response to the

Government's Statement of Facts and its "fail[ure] to cite to any record evidence whatsoever").

Much to the Court's surprise, however, Speqtrum has again ignored these basic instructions.

To begin with, Defendant has failed to produce a <u>separate</u> statement of genuine issues of fact.  Instead, it has merely incorporated <u>within</u> its Opposition brief a series of numbered paragraphs that purport to serve as a "Response" to the Government's Statement.  <u>See</u> Opp. at 2-11.  The significance of this formatting error, however, pales in comparison to the substantive deficiencies afflicting the so-called Response.  In the vast majority of the paragraphs, Speqtrum baldly asserts its version of the facts without any record citation whatsoever, <u>see</u> Response, ¶¶ 10, 16, 21-23, 25-26, 29-32, 36-37, 42-43, or cites only to evidence the Court has already deemed inapposite.  <u>See id.</u>, ¶¶ 12, 14, 34.  Several of its stated "disputes," moreover, stem from its aforementioned misrepresentation of the Court's prior holdings.  <u>See id.</u>, ¶¶ 13, 28, 34.  One paragraph – spanning several pages – is devoted solely to legal argumentation rather than factual disagreements.  <u>See id.</u>, ¶ 14.  And, although Speqtrum has attached two new exhibits to its Opposition, its Response makes precisely one reference to them, and only in support of an immaterial assertion.  <u>See id.</u>, ¶ 42.  Their significance thus remains unclear.

In resolving a summary-judgment motion, Local Rule 7(h)(1) directs the Court to "assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Given the myriad deficiencies in Speqtrum's filings and its casual contempt for the Federal Rules, the Local Rules, and this Court's prior directives, those facts identified in the Government's Statement will be deemed admitted.  <u>See Lu v. Lezell</u>, 45 F. Supp. 3d 86, 92 (D.D.C. 2014) (treating defendant's facts as true in light of plaintiff's failure to comply with LCvR 7(h)); <u>Valles-Hall v. Ctr. for Nonprofit Advancement</u>, 481 F. Supp. 2d 118, 123-24 (D.D.C. 2007) (same).

C.  Liability under the False Claims Act

Having dispensed with such threshold matters, the Court turns to the major substantive issue presented by the United States's renewed Motion – namely, Speqtrum's liability under the FCA.  The central thrust of the Government's briefing is that Defendant violated the Act *vis-à-vis* its invoices for services rendered without an operative plan of care.  The Court will first set out the legal framework for evaluating that claim and then consider its application to the facts at hand.  In so doing, it notes that Plaintiff's briefing also makes passing mention of amorphous "recordkeeping" deficiencies.  See Reply at 12; see also Opp. at 3.  Insofar as such references are intended to serve as a request for judgment on that conduct, Plaintiff has failed to sufficiently articulate or develop its reasoning.  The Court limits its analysis, accordingly, to the plan-of-care infractions.

The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  United States v. Neifert-White Co., 390 U.S. 228, 232 (1968); see also United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1167 (10th Cir. 2010) ("The FCA 'covers all fraudulent attempts to cause the government to pay out sums of money.'").  Although the Government invoked multiple provisions of the FCA in its initial Motion, its present submission rests solely on 31 U.S.C. § 3729(a)(1).  Under that section, a provider may be held liable if it "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  To prove a violation of § 3729(a)(1), the Government must show that "(1) defendant submitted a claim to the government; (2) which was false; and (3) which the defendant knew was false."  United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 57 (D.D.C. 2007) (internal quotation marks omitted).

In its prior Opinion, the Court found the first element readily satisfied here.  Under the FCA, a "claim" is defined broadly as "any request or demand . . . for money or property."  31 U.S.C. § 3729(c).  It includes requests "made to a contractor, grantee, or other recipient" – such as the District government – "if the United States Government provides any portion of the money" or "will reimburse [the] contractor, grantee, or other recipient for any portion of the money" requested by the provider.  Id.  Because state Medicaid expenditures are, in part, reimbursed by the federal government, "Medicaid claims submitted to a state are . . . 'claims' to the federal government under the FCA."  United States v. Rogan, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006); accord United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 493 (D.C. Cir. 2004).  Each request for payment that Speqtrum submitted to the District, the Court concluded, thus qualified as an FCA "claim."  Speqtrum I, 47 F. Supp. 3d at 90.

The rest of the inquiry, however, posed a more difficult question.  After careful consideration, the Court determined that the Government had fallen just short of mustering sufficient evidence to warrant judgment as a matter of law on either falsity (prong two) or scienter (prong three).  See id. at 91-95.  As Plaintiff's renewed Motion substantially shores up its case, the Court now returns to these elements.

    1.  *Falsity*

False claims under the FCA may assume a variety of forms.  First, a claim can be factually false if it "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  United States v. Science Applications Intern. Corp. (SAIC), 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001)).  Such claims are "paradigmatic" violations of the FCA.  Id.  Next, a claim can be false if the request for payment itself expressly, yet falsely, certifies "compliance

with an applicable federal statute, federal regulation, or contractual term." Id. Finally, a claim may be false if it impliedly certifies such compliance. See id.

Unlike the claims disposed of in the Court's prior Opinion, those at issue in this renewed Motion are not "factually false" – that is, the Government does not contend that Speqtrum sought payment for services it did not actually provide. Nor does it argue that Defendant expressly certified "compliance with an applicable . . . statute, . . . regulation, or contractual term" in its various reimbursement requests. SAIC, 626 F.3d at 1266. The Government instead invokes the third species of falsity – i.e., the "implied-certification theory" of liability.

Implied certification occurs when the provider requests payment and remains silent as to its non-compliance with a contractual term or regulation that "was a prerequisite to the government [payment] sought." Id. (quoting United States ex. rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000)). Liability "is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal" – or, in the case of Medicaid, state-based – "rules that are a precondition to payment." Mikes, 274 F.3d at 699. Put another way, if a provider is asking for payment, it is fair to assume that she has done everything necessary to merit reimbursement. If she has not, there may be an FCA violation.

As the Court observed in its prior Opinion, the Government "included plenty of evidence" with its initial Motion "showing that Speqtrum [had] violated various regulatory requirements." Speqtrum I, 47 F. Supp. 3d at 92. As pertinent here, § 5006 of the D.C. Code requires providers to develop a written plan of care for delivery of services shortly after a patient's referral. See D.C. Mun. Regs., tit. 29, §§ 5006.1, 5006.2. Such plans must "specify the frequency, duration[,] and expected outcome of the services rendered" and be approved and

"signed by the physician within thirty (30) days of prescription," as must any subsequent

modifications.  Id. §§ 5006.3, 5006.6.  Yet, according to the Government's uncontroverted

evidence, "many Speqtrum [patient] files lacked a plan of care, contained unsigned plans of

care[] or . . . plans of care with forged physician signatures."  Speqtrum I, 47 F. Supp. 3d at 92

(citing Pl. First MSJ, Att. 2 (Declaration of FBI Agent Gregg C. Domroe), ¶¶ 8, 12, 15-16; id.,

Exh. 3A-E (FBI Doctor Interviews)).

FCA liability, however, does not attach upon violation of just any regulatory obligation.

Rather, "the requirement violated must be material to the Government's decision to pay."

Speqtrum I, 47 F. Supp. 3d at 92; accord SAIC, 626 F.3d at 1269.  Plaintiff must show,

accordingly, that had it known about Speqtrum's non-compliance, it might not have paid for its

services.  See Lemmon, 614 F.3d at 1169 ("[F]alse certification – regardless of whether it is

implied or express – is actionable under the FCA only if it leads the government to make a

payment which, absent the falsity, it may not have made.").  This is particularly important in the

Medicaid and Medicare context, where providers face an abundance of regulations, some of

which may be more vital to the Government's payment decisions than others.  For example, if

compliance with every D.C. regulation were essential, a provider could be charged under the Act

for something as innocuous as having a policy manual that was not entirely up to snuff or failing

to update its "organizational chart."  D.C. Mun. Regs., tit. 29, § 5002.

This is where the Government's initial Motion faltered.  Notwithstanding its sweeping

assertion that the presence of all required documentation – including a plan of care – in a

patient's file is material to payment under the D.C. Code, it failed to clearly point to any facts or

statutory provisions so proving.  To be sure, Plaintiff did invoke § 1301.2(a), which states that

"the District may deny payment if a provider "[k]nowingly and willfully made or caused to be

made any false statement or misrepresentation of <u>material</u> fact in" requesting payment."  But, as

the Court explained, § 1301.2(a) "does no more than frame the question: which facts and

regulations are material?"  <u>Speqtrum I</u>, 47 F. Supp. 3d at 92.

Plaintiff also emphasized Speqtrum's contract with the District, which – taken at face

value – suggests that a provider's violation of <u>any</u> regulatory requirement might lead to

nonpayment.  <u>See</u> Medicaid Provider Agreement at 17 ("If the Department determines that a

provider has failed to comply with the applicable Federal or District law or rule . . . , the

Department may . . . [w]ithhold all or part of the providers' payments" and "[t]erminate the

agreement.").  Although somewhat more persuaded by this latter argument, the Court registered

its doubt that the District <u>in practice</u> levies such harsh sanctions for every single regulatory

infraction – no matter how minor.  <u>See</u> <u>Speqtrum I</u>, at 93 (expressing disbelief that "the District

ever denies payment on the basis of a provider's use of an outdated organizational chart, even if

it could conceivably do so").  Without further evidence indicating the materiality of the

particular breaches at issue here, the Court could not compel judgment in the United States's

favor.

In its renewed Motion, Plaintiff has directly and cogently addressed its prior omission.

Specifically, it has submitted a supplemental declaration authored by Claudia Schlossberg, the

Director of the District's Medicaid Program.  Schlossberg there directs the Court's attention to

29 D.C.M.R. § 5009.4, which limits a provider's reimbursement to "the <u>authorized</u> services

provided to clients."  (Emphasis added); Mot., Exh. A. (Schlossberg Declaration), ¶ 10.  As she

explains – and as the regulatory scheme confirms – absent an operative plan of care endorsed by

the patient's medical professional, any services provided are considered unauthorized.  <u>See</u>

Schlossberg Decl., ¶ 10 ("DHCF requires that all PCA services be 'authorized' in that they are in

accordance with the patient's plan of care and prescribed only by a physician or advanced

practice registered nurse . . . .") (citing D.C. Mun. Regs., tit. 29, §§ 5004, 5006, 5009.4).  Had the

District known that Speqtrum was billing for services not sanctioned by a valid plan of care, it

would not have picked up the tab.  See id., ¶¶ 13-17 (averring that District does not reimburse for

services rendered pursuant to an unsigned or forged plan of care, in the absence of a plan of care,

or pursuant to a plan of care signed after date of service or outside 30-day period for renewal).

The Government has thus substantially reinforced its assertion that Speqtrum's regulatory

infractions were, in fact, material to payment.  Indeed, it has taken the additional step of

explaining why that is so.  The budget for the District's Medicaid program is not, of course,

unlimited.  As such, personal-care services are to be reimbursed only insofar as they are

"necessary."  D.C. Mun. Regs., tit. 29, § 5000.2; see Reply at 9.  The plan-of-care certification

process – which requires a patient's physician or advanced-practice nurse to sign off on all care

to be provided – is the mechanism by which the District ensures that such necessity

determinations are made by a medical professional responsible for a patient's wellbeing, not by a

profit-motivated homecare agency like Speqtrum.  See Schlosserg Decl., ¶¶ 10-17; Reply at 9

(The plan-of-care regulations are "designed to ensure that a licensed and knowledgeable medical

professional is involved in and overseeing the beneficiary's care, and making medical

determinations regarding what is and is not needed.").  Speqtrum's plan-of-care deficiencies,

therefore, are not minor regulatory infractions; rather, they are fundamental defects that lie at the

very heart of its claims for reimbursement.  See id. at 9-10.

Against the Government's beefed-up submissions, Speqtrum raises little factual dissent.

Notably, it makes no objection to the plan-of-care infirmities as recounted by Plaintiff.  It instead

makes a feeble attempt to resurrect its prior assertion that DHCF did not, in practice, require

authorization by a physician – *i.e.*, signed plans of care – as a prerequisite to reimbursement of

services.  <u>See</u> Opp. at 4; <u>Speqtrum I</u>, 47 F. Supp. 3d at 97.  Rather than proffering new evidence

in support of that claim, however, it cites the same material it submitted with its initial briefing.

<u>See</u> Opp. at 4 (citing Speqtrum's Initial Reply, Exh. 2 (e-mail thread entitled "Action Steps for

Early PA Number Release")).  The Court has already deemed that document inapt, <u>see</u> <u>Speqtrum</u>

<u>I</u>, 47 F. Supp. 3d at 97, and Defendant presents no cause to revisit that determination.

      In lieu of raising any genuine factual dispute, Speqtrum seeks shelter in <u>U.S. ex rel. Davis</u>

<u>v. District of Columbia</u>, 679 F.3d 832 (D.C. Cir. 2012), a *qui tam* suit brought by a

whistleblower under the False Claims Act against the District of Columbia Public Schools.  Yet

<u>Davis</u> did not concern materiality, and partial dismissal there rested on the theory that the

Government had authorized all services rendered and received precisely what it paid for, even if

certain supporting documentation was missing.  Here, conversely, the plans of care serve as the

means by which services are authorized to be provided in the first instance.  The failure to obtain

such authorization, as Plaintiff explains, is "tantamount to a failure to have permission from the

United States to provide the service in any instance."  Reply at 10.  It follows, then, that any

services furnished in the absence of such endorsement lack value to the United States.  <u>See</u> <u>id.</u> at

10-11.  Unlike <u>Davis</u>, accordingly, the Government here did not receive all it had paid for.  On

the contrary, its intent was to reimburse only those services deemed necessary by a medical

professional, when in fact it was bankrolling any services that Speqtrum unilaterally opted to

provide.  As such, the holding in <u>Davis</u> is of no aid to Defendant.

      Based on the uncontroverted facts, the Court concludes that the regulatory provisions that

Speqtrum violated – which mandate that services be rendered under the auspices of a valid plan

of care – are, indeed, material to payment.

2.  Scienter

To establish the final element of an implied-certification claim, *scienter*, the Government must prove that Defendant knew both "(1) that it violated a contractual obligation" or regulation, and "(2) that its compliance with that obligation was material to the government's decision to pay." SAIC, 626 F.3d at 1269.  The requisite knowledge is defined broadly under the FCA to encompass "actual knowledge," "deliberate ignorance," or "reckless disregard."  31 U.S.C. § 3729(b).  Actual knowledge looks at "subjective knowledge," while deliberate ignorance "seeks out the kind of willful blindness from which subjective intent can be inferred."  Hockett, 498 F. Supp. 2d at 57 (internal quotation marks omitted).  Reckless disregard, by contrast, "is an extension of gross negligence, or gross-negligence-plus."  Id. (internal quotation marks omitted).

In its prior Opinion, the Court held that the Government had handily satisfied the first half of the inquiry – *viz.*, awareness of the violation – with regard to the plan-of-care deficiencies.  According to the United States's uncontroverted evidence, many high-level employees had actual knowledge that patients did not have valid plans of care in place, and the issue was raised repeatedly at staff meetings to little effect.  See Speqtrum I, at 47 F. Supp. 3d at 94 (citing Pl. First MSJ, Exh. 15 (FBI Interview with Camille Gabriel, Speqtrum's Assistant Quality Assurance Manager) at 1-2).  Before audits, those same employees would deliberately "clean up" files that they knew were faulty.  See id. (citing Pl. First MSJ, Exh. 16 (FBI Interview with Jozanne Browne) at 1-3).  Defendant had presented nothing, explained the Court, to rebut the Government's evidence that those employees' conduct was within the scope of their employment and thus attributable to Speqtrum.  See id.; cf. United States v. O'Connell, 890 F.2d 563, 569 (1st Cir. 1989) ("[A] corporation should be held liable under the False Claims Act for

the fraud of an agent who acts with apparent authority even if the corporation received no benefit from the agent's fraud.").

The Court found, moreover, that Speqtrum's President and Founder, Pauline Nnawuba, was either aware of the plan-of-care infirmities, or – at a minimum – that she had "exhibit[ed] reckless disregard or deliberate ignorance of the company's non-compliance." Speqtrum I, 47 F. Supp. 3d at 94. In particular, the Court noted that "[t]he vast majority of Speqtrum's files had obvious deficiencies, and even a cursory inspection of some files would have revealed that fact." Id. And, although she knew that at least one high-level employee had been committing rampant fraud as early as 2008, she did nothing about it other than to let the employee go – *i.e.*, she made no attempt to remedy widespread company practice, identify problematic files, or investigate any further evidence of corruption. See id. at 86-87, 94.

The second element – awareness that compliance with the relevant regulations was material to payment – posed a slightly more difficult question. The Court found some of the evidence presented by the Government highly suggestive of such cognizance. See id. at 94. In particular, the Court emphasized that the files were "cleaned up" before auditing, and that the language in Speqtrum's Medicaid contract links regulatory noncompliance to nonpayment. See id. It held, however, that "[t]he Government ha[d] not provided enough evidence of awareness of materiality for . . . [the] implied-certification claims to merit judgment as a matter of law – particularly where the Court ha[d] found that materiality itself remain[ed] in dispute." Id.

The status quo has now shifted significantly. As explained above, see Part III.C.1, *supra*, the Government's supplemental evidence sufficiently demonstrates that operative plans of care are material to payment. That hurdle surmounted, the Court is also satisfied at this juncture that Speqtrum possessed the requisite *scienter*. In addition to the evidence discussed in its previous

Opinion, it takes into account the fact that 29 D.C.M.R. § 5009 puts Speqtrum – and all providers – on notice that only "authorized" services are subject to reimbursement, and that § 5004 and § 5006 make clear that such authorization is effectuated via a valid, physician-endorsed plan of care.  See D.C. Mun. Regs., tit. 29, §§ 5004, 5006, 5009.4.  It notes, moreover, that Defendant has provided not a shred of evidence placing *scienter* in dispute.  Indeed, its present Opposition neglects to address the issue of *scienter* entirely.  The Government's submissions thus carry the day.

*   *   *   *

In sum, then, the United States has proved that it is entitled to summary judgment on Defendant's liability arising from its plan-of-care deficiencies.  On that front, Plaintiff has submitted uncontroverted evidence that Speqtrum knowingly withheld information about its noncompliance with material regulatory requirements.

D.   Damages

The Court's task, however, is not yet complete.  The Government maintains that it suffered extensive monetary losses as a result of Speqtrum's misconduct, to the tune of $1,840,724.92.  Although its opening brief makes no reference to its request for damages, its Reply belatedly seeks summary judgment on the entirety of that sum.  See Reply at 14-16.

The Court cannot acquiesce.  The Government made the identical request in its initial Motion.  See Speqtrum I, 47 F. Supp. 3d at 96.  In support of its position, it submitted two declarations from FBI Agent Gregg Domroe, who had reviewed all the files and calculated the amount of damages.  See id.  The Court ultimately denied Plaintiff's request, noting – among other things – that Domroe's declarations did not make clear how damages were calculated.  See id.  Instead, "with the exception of a few fleshed-out examples, they simply state the amount of funds the Government believes it has lost."  Id.  at 97.  Because "the Government ha[d] not

produced evidence that would necessarily convince a reasonable jury that it is entitled to the full sum that it desires," the Court found judgment on the question of damages to be premature.  Id. at 97.

In its renewed Motion, the Government has failed to proffer a supplemental explanation of its calculations.  Instead, it rests solely on the declarations it submitted with its initial Motion. See Reply at 14-15 (rehashing the two Domroe declarations).  As such, the Court's prior ruling governs here.

**IV.     Conclusion**

For the foregoing reasons, the Court concludes that summary judgment is warranted as to Speqtrum's liability stemming from its plan-of-care transgressions, but reserves judgment on the Government's calculation of damages.  The Court will therefore grant the United States's Motion for Summary Judgment in part and deny it in part.  A separate Order consistent with this Opinion shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  July 8, 2015